**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

ROCKY MOUNTAIN PEACE &
JUSTICE CENTER; CANDELAS
GLOWS/ROCKY FLATS GLOWS;
ROCKY FLATS RIGHT TO KNOW;
ROCKY FLATS NEIGHBORHOOD
ASSOCIATION; ENVIRONMENTAL
NETWORK (EIN) INC.,

     Plaintiffs - Appellants,

v.

UNITED STATES FISH AND WILDLIFE
SERVICE; MARTHA WILLIAMS, in her
official capacity as Principal Deputy
Director, United States Fish and Wildlife
Service; DEBRA HAALAND, in her
official capacity as Secretary of the
Interior; DAVID LUCAS, in his official
capacity as Project Leader, Region 6, U.S.
Fish and Wildlife Service; UNITED
STATES FEDERAL HIGHWAY
ADMINISTRATION; STEPHANIE
POLLACK, in her official capacity as
Acting Administrator of the United States
Federal Highway Administration; PETER
BUTTIGIEG, in his official capacity as
Secretary of Transportation,

     Defendants - Appellees.

No. 21-1310

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-01017-PAB)**
_____

Randall M. Weiner, Weiner & Cording (Annmarie Cording, Weiner & Cording; Andrew G. Ogden, with him on the briefs) Boulder, Colorado, for Plaintiffs-Appellants.

Michelle Melton (Todd S. Kim, Assistant Attorney General; Andrew Mergen, Ellen Durkee, Jessica Held, Lesley Lawrence-Hammer, Attorneys; Kate Williams-Shuck, Attorney-Advisor, with her on the briefs) U. S. Department of Justice, Washington, D.C., for Defendants-Appellees.

_____

Before **MATHESON**, **KELLY**, and **McHUGH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

This appeal concerns the United States Fish and Wildlife Service's (the "Service") decision to modify certain trail paths in the Rocky Flats National Wildlife Refuge (the "Refuge").

Appellants[1] are organizations that challenge the Service's 2018 decision to modify trails in the Refuge that have been designated for public use. Led by the Rocky Mountain Peace and Justice Center (the "Center"),[2] they sued the Service and others,[3] claiming they failed to comply with various federal statutes and regulations, including the National Environmental Policy Act of 1969 ("NEPA") and the

_____

[1] Rocky Mountain Peace and Justice Center, Candelas Glows/Rocky Flats Glows, Rocky Flats Right to Know, Rocky Flats Neighborhood Association, and Environmental Information Network (EIN) Inc.

[2] We refer to Appellants collectively as "the Center."

[3] The suit named the United States Federal Highway Administration and several officials in their official capacities. We refer to Appellees collectively as "the Service."

Endangered Species Act of 1973 ("ESA"). The Center also moved for a preliminary injunction and for the district court to supplement the administrative record and consider evidence from outside the record. The district court denied the Center's NEPA claims, dismissed its ESA claim for lack of standing, and denied its motions.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

We describe relevant statutes and regulations, summarize the factual and procedural history, and then turn to our analysis.

### A. *Relevant Statutes and Regulations*

Three statutes and their implementing regulations are relevant for this appeal: (1) the Administrative Procedure Act ("APA"), (2) NEPA, and (3) the ESA.

### 1. The Administrative Procedure Act

The APA provides a private right of action to challenge agency actions that violate NEPA. *Utah Env't Cong. v. Russell*, 518 F.3d 817, 823 (10th Cir. 2008).

Under the APA, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof." 5 U.S.C. § 702. A court will set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

2.  **The National Environmental Policy Act**

"NEPA established a national policy to promote the understanding of the ecological systems and natural resources important to the United States, and thereby reduce or eliminate environmental damage." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1050 (10th Cir. 2014) (quotations omitted).

"NEPA does not provide for a private right of action," so we review a NEPA challenge under the standards set forth in the APA. *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000). "NEPA does not mandate particular results or create substantive limits." *Biodiversity Conservation All.*, 762 F.3d at 1050. It instead "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). We summarize the relevant procedural requirements.

a.  *The EIS and preparation of the supplemental EIS*

A federal agency must prepare an environmental impact statement ("EIS") before it takes a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must provide "a detailed statement" on (i) "the environmental impact of the proposed action," (ii) "any adverse environmental effects which cannot be avoided," (iii) "alternatives to the

proposed action," (iv) "the relationship between local short-term uses of man's environment and . . . enhancement of long-term productivity," and (v) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action." *Id.*

The Council on Environmental Quality ("CEQ") has promulgated regulations governing the preparation of an EIS. 40 C.F.R. §§ 1500-1508.28.[4] The agency preparing the EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," "[i]nclude the alternative of no action," and "if one or more exists," "[i]dentify the agency's preferred alternative." *Id.* § 1502.14(a), (d), (e).

After an agency has issued an EIS, it must prepare a supplemental EIS if (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1)(i)-(ii).

Once the agency has completed its EIS and supplemental EIS as needed, it must wait a prescribed period of time before it may make a decision on the proposed action. *Id.* § 1506.10. When the agency makes a decision, it "shall prepare a concise public record of decision ['ROD']," which must (1) "[s]tate what the decision was," (2) "[i]dentify all alternatives considered by the agency in reaching its decision," and

---

[4] The CEQ revised the NEPA regulations in 2020, but the 2018 regulations applied to this case. We cite to the 2018 regulations accordingly.

(3) "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." *Id.* § 1505.2.

    b. *Exceptions to the EIS requirement*

When an agency is uncertain as to whether a new project warrants an EIS, it may prepare an environmental assessment ("EA"), a concise statement that presents evidence explaining whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. "[I]f the agency determines on the basis of the environmental assessment not to prepare" an EIS, then it must prepare a finding of no significant impact ("FONSI"). *Id.* § 1501.4(e). A FONSI is "a document by a federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." *Id.* § 1508.13.

An agency may also identify categorical exclusions of actions that do not require preparation of either an EA or an EIS. A categorical exclusion "means a category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* § 1508.4. To establish these categorical exclusions, the agency must determine that such projects have no major environmental effect. *Id.* But the agency must also allow "for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* In such extraordinary circumstances, an agency cannot rely on the categorical exclusions to avoid preparing an EA or an EIS.

The Department of Interior has set forth categorical exclusions in its

Departmental Manual.  516 DM § 8.  Under the Manual, the Service does not have to

conduct an additional NEPA analysis if the proposed action consists of:

1) "[m]inor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures,"

2) "[m]inor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated," or

3) "[t]he issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned."

*Id.* § 8.5(B)(7), (9)-(10).

As noted, the Service cannot rely on categorical exclusions if certain

extraordinary circumstances apply, including when the proposed action may have

(1) "significant impacts on public health or safety," or (2) "highly controversial

environmental effects."  43 C.F.R. § 46.215(a), (c).

3.  **The Endangered Species Act**

"The Endangered Species Act of 1973 is intended to protect and conserve

endangered and threatened species and their habitats."  *Nat'l Ass'n of Home Builders*

*v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007) (citation omitted).  "Section 7 of the

ESA prescribes the steps that federal agencies must take to ensure that their actions

do not jeopardize endangered wildlife and flora."  *Id.* at 652.  An agency must ensure

its actions are (1) "not likely to jeopardize the continued existence of any endangered

species" or (2) not likely to "result in the destruction or adverse modification of

habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

Once an agency determines that its action "is likely to jeopardize" an endangered species or its habitat, it must consult with the Service. 50 C.F.R. § 402.10(a). This consultation may be formal or informal. *Id.* §§ 402.13 (informal), 402.14 (formal). If, after the consultation, the Service determines "that the action is not likely to adversely affect listed species or critical habitat, . . . no further action is necessary." *Id.* § 402.13(c); *see also id.* § 402.14(m)(3). But if the Service concludes that the proposed action may jeopardize an endangered species or its habitat, the agency must either terminate the action, implement a proposed alternative, or seek an exemption. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1106 (10th Cir. 2010).

Unlike NEPA, the ESA provides a private right of action to challenge agency actions that violate the statute's provisions. 16 U.S.C. § 1540(g)(1).

### B. *Factual History*

We begin by recounting the history of the Refuge and the cleanup efforts. We then summarize the ensuing administrative actions regarding use of the Refuge.

### 1. **History of the Refuge**

The Rocky Flats National Wildlife Refuge covers approximately 6,200 acres of land surrounding a former nuclear defense facility operated by the U.S. Department of Energy ("DOE"). AR 1343. From 1951 to 1989, DOE manufactured

8

nuclear weapons in an area in the middle of the site known as the Industrial Area. AR 1353.

In 1989, the Environmental Protection Agency ("EPA") added the site to the CERCLA National Priorities List[5] because production at the facility released hazardous substances, including radionuclides,[6] into the surrounding area. AR 5518. By placing the site on the National Priorities List, EPA committed to a large-scale cleanup operation.

During the 1990s and early 2000s, EPA coordinated the cleanup process with DOE and the Colorado Department of Public Health and Environment ("CDPHE"). AR 1353. As part of this process, the agencies collected thousands of soil samples to test radionuclide levels in the soil. After consultation with local stakeholders, they set the cleanup standard for eventual public use of the Refuge at 50 picoCuries per gram (pCi/g).[7] AR 5718, 5528. At 50 pCi/g, Refuge workers[8] would have an

---

[5] CERCLA stands for the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675. The CERCLA National Priorities List contains "national priorities among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States." 54 Fed. Reg. 41,015, 41,015 (Oct. 4, 1989).

[6] Radionuclides are atoms that emit radiation as they undergo radioactive decay through the emission of alpha particles, beta particles, or gamma rays.

[7] A pCi/g is a measure of the rate of radioactive decay of plutonium.

[8] Refuge workers were defined as individuals who worked four hours indoors and four hours outdoors in the area for 250 days each year for 18.7 years. AR 1094.

increased cancer risk of around 1 in 133,300. AR 1094. For Refuge visitors,[9] it would be around 1 in 227,000. *Id.* The agencies deemed any exposure levels below 50 pCi/g fall within the acceptable risk range. AR 5528. This map shows pre-cleanup pCi/g concentration levels in the site:



Figure 4. Pre-Cleanup Plutonium Concentrations in Surface Soils

AR 1362.

---

[9] Refuge visitors were defined as (1) children who were outside for 2.5 hours for 100 days a year for six years or (2) adults who were outside for 2.5 hours for 100 days a year for 24 years. AR 1094.

In 2001, while cleanup was ongoing, Congress enacted the Rocky Flats National Wildlife Refuge Act, Pub. L. No. 107-107, 115 Stat. 1012. Under the Act, DOE "was to manage the" Industrial Area, and "the balance of the Flats was to become a National Wildlife Refuge run by the Service." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 681 (10th Cir. 2015). Congress directed DOE to "transfer to the Service administrative jurisdiction of the land marked for refuge status as soon as the EPA determined the cleanup was complete." *Id.*

2. **The 2004 Comprehensive Conservation Plan and Environmental Impact Statement**

In 2004, the Service issued the Final Comprehensive Conservation Plan and Environmental Impact Statement ("2004 CCP/EIS"), which confirmed that DOE was completing the cleanup under EPA's and CDPHE's oversight. AR 1353. It also confirmed that after completion of the cleanup, DOE would transfer jurisdiction to the Service. AR 1353-54. It noted that "[t]he majority of the site has remained undisturbed since its acquisition, and provides habitat for . . . two species that are federally listed as threatened (bald eagle and Preble's meadow jumping mouse)." AR 1354.

The 2004 CCP/EIS set six goals for Refuge management, including public use. AR 1357. It acknowledged that "the estimated increased cancer risk from exposure to residual soil contamination of 7 pCi/g is 1 in 1 million for the Refuge worker and 0.6 in 1 million . . . for the Refuge visitor," but concluded that "the majority of the public use facilities would be located in areas where the residual contamination is

much lower (less than 1 pCi/g)." AR 1363. Under the 2004 CCP/EIS's preferred

alternative, public use "would include about 16 miles of trails, a seasonally staffed

visitor contact station, trailheads with parking, and developed overlooks." AR 1368.

Most of these trails "would use existing road corridors," and the public could access

these trails by foot, bicycle, or horse. *Id.* The following map in the 2004 CCP/EIS

depicts the proposed trails:



AR 1373.

In 2005, the Service issued the ROD, which adopted the preferred alternative

in the 2004 CCP/EIS for public use. AR 1312-26. Cleanup efforts continued, and in

2007, EPA certified that the cleanup had reached the point where DOE would

transfer the Refuge (excluding the Industrial Area) to the Service. 72 Fed.

Reg. 29,276, 29,276 (May 25, 2007). In doing so, EPA "determined that the

[relevant portion of the Refuge] poses no significant threat to public health or the environment and, therefore, no further remedial measures pursuant to CERCLA are appropriate." *Id.* It left the Industrial Area on the National Priorities List and under DOE's jurisdiction. *Id.* The Service took control of the remainder of the Refuge. AR 4.

3.  **The Section 16 Parcel**

In 2011, the Service began studying whether to acquire an approximately 640-acre parcel adjacent to the southwest boundary of the Refuge (the "Section 16 Parcel"). AR 1045. Several mines, including a clay mine and a coal mine, previously operated on the Section 16 Parcel, but no nuclear activities occurred there. AR 1041.

The Service conducted a site assessment consisting of "research, sampling, and site visits," which "found no known or observable environmental contaminant[] issues related to the parcel." AR 1038. As part of this assessment, the Service relied on soil samples taken from the Refuge in 2006. AR 1047. The soil samples, which were "collected adjacent to the northern and eastern property boundaries" of the Section 16 Parcel—closer to the Industrial Area—"yielded actinide concentrations well below 1 pCi/g." *Id.* During the site visits, the Service identified a "rusted storage barrel" that "appears to be empty" near a pond within the State Clay Mine. AR 1048; *see also* AR 1054. It recommended the barrel's removal. AR 1038.

On December 2, 2011, the Service prepared an EA evaluating whether to expand the Refuge to include the Section 16 Parcel.  AR 1000-03.  The Service concluded that the proposed annexation:

1) "would pose minimal risk to public health and safety;"

2) was "not highly controversial;" and

3) after performing "a formal intra-Service section 7 consultation," the proposed action "will not result in the jeopardy of any federally threatened or endangered species, or adversely modify existing designated critical habitat," including for the Preble's meadow jumping mouse.

AR 1002.  The EA made a finding of no significant impact—a FONSI—and therefore concluded that the Service did not need to prepare a supplemental EIS.  AR 1004.

The Service finalized the annexation of the Section 16 Parcel in 2012. AR 432.

4. **The 2018 Environmental Action Statement**

In 2018, the Service issued an Environmental Action Statement ("2018 EAS"), which is the agency action challenged here.  The Service prepares an EAS instead of an EA when it concludes the action falls within a categorical exclusion but may be controversial.  550 FW § 3.3(C)(2)(b).  Two aspects of the 2018 EAS are relevant to that challenge:  (1) the actual changes the Service made to the 2004 CCP/EIS, and (2) certain proposed changes the Service might consider in the future.

a. *Changes made in the 2018 EAS*

In the 2018 EAS, the Service made changes to the trail configurations proposed in the 2004 CCP/EIS.  Among them was modification of the Rocky

Mountain Greenway trail, an eight-mile trail that would run from the northern border

of the Refuge to the southwest, then continue eastward to the south of the Industrial

Area.  AR 7.  The 2018 EAS added about one mile to the Rocky Greenway trail,

extending it into the Section 16 Parcel "to provide access to the historic Caprock

Mine." *Id.*[10]  The Service included the following map to show the revised trail paths:



_____

[10] The 2018 EAS also (1) transformed the Walnut Creek trail into a loop; (2) changed the path of the Rock Creek trail; (3) converted the Lindsay Ranch Loop, East Woman Creek Loop, and East Woman Creek Connector trails to multiple use trails; (4) prohibited the off-trail use of the southern part of the Refuge; and (5) established sensitive wildlife areas in Walnut Creek, Rock Creek, and Antelope Springs drainages.  AR at 7-8.

15

*Id.*[11]

The Service determined the trail modifications were eligible for three categorical exclusions because they were (1) "minor changes in the amounts or types of public use on Service . . . lands, in accordance with existing regulations, management plans, and procedures"; (2) "minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated"; and (3) were part of "the issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned." AR 9. The Service thus determined the trail modifications did not merit preparation of an EA or an EIS. AR 1.

The Service also concluded that the changes did not involve any extraordinary circumstances prohibiting the use of the categorical exclusions. AR 9-10.

b. *Potential changes suggested in the 2018 EAS*

The Service also identified potential changes to the eastern portion of the Rocky Mountain Greenway trail.[12] AR 8. One change would shift the eastern part of the trail northward into an area to the east of the Industrial Area known as the Wind

---

[11] The Rocky Mountain Greenway is highlighted in green. The one-mile addition to the Rocky Mountain Greenway trail appears in the southwest corner of the map.

[12] This proposed change is reflected in the map above in the red box to the east of the Industrial Area.

Blown Area.[13]  The Service also suggested adding an access point to the Refuge in the Wind Blown Area.

The Service excluded these changes from its 2018 EAS analysis, emphasizing they "*may* or *may not* occur in the future," AR 6, so "[i]f these items proceed, an additional NEPA determination will be required," AR 8.

## C. *Procedural History*

Shortly after issuance of the 2018 EAS, the Center sued, claiming violations of the APA, NEPA, the ESA, and the National Wildlife Refuge Systems Administration Act (the "Refuge Act").  It alleged that the Service:

1) should have prepared a new or supplemental EIS based on the significance of the approved trail modifications,

2) incorrectly concluded the approved changes were not extraordinary circumstances and thus erroneously relied on the use of the categorical exclusions,[14]

3) improperly excluded the proposed trail modification in the Wind Blown Area from the NEPA analysis,

4) failed to adequately consult with the relevant agencies under Section 7 of the ESA regarding the Preble's meadow jumping mouse when it made the changes to the trails, and

5) violated the Refuge Act by opening the Refuge for trail use.

---

[13] The Center and the Service both use "Wind Blown Area" to refer to the eastern portion of the Refuge that is downwind of the Industrial Area.  *See* Aplt. Br. at xii; Aplee Br. at 13 n.7, 32.

[14] The Center presented six extraordinary circumstances at the district court, but it abandoned four of them on appeal.  *Compare* App. at 1000-04 *with* Aplt. Br. at 29.

The Center moved for a preliminary injunction to block construction of the trails and the opening of the Refuge. After holding an evidentiary hearing, the district court denied the motion, finding that the Center failed to show irreparable harm. The court also dismissed the Center's ESA claim because it did not have standing.

The Center asked the district court to supplement the administrative record. It argued the Service improperly excluded:

1) a 2012 study by Marco Kaltofen regarding plutonium exposure levels on the eastern part of the Refuge (the "2012 Kaltofen Study"),

2) a 2006 jury verdict form from a trial finding two corporate defendants liable for trespassing on plaintiffs' property to the east of the Refuge by exposing the property to plutonium (the "Cook verdict form"),

3) a 2011 email chain between Service officials discussing a possible trail alteration close to the "plutonium plume" (the "2011 email chain"), and

4) a 2018 declaration by Harvey Nichols regarding plutonium testing in the 1970s.

The Center also asked the district court to consider extra-record evidence before deciding the merits. It pointed to

1) testimony from witnesses at the preliminary injunction hearing,

2) a memorandum regarding the Service's decision to relocate prairie dogs to the Refuge, and

3) soil sampling taken in 2019 that indicated elevated levels of plutonium to the east of the Refuge.

It argued this evidence undermined the 2018 EAS.

After briefing on the merits, the district court denied the Center's remaining claims. It also rejected the Center's requests to supplement the administrative record and to consider extra-record evidence. The Center timely appealed.

## II. DISCUSSION

The Center challenges the district court's (A) dismissal of its ESA claim for lack of standing, (B) denial of its petition for review regarding its NEPA claims, and (C) refusal to supplement the record or consider extra-record evidence.[15]

### A. *Standing*

We first address the Center's standing to bring its NEPA and ESA claims.[16] We review "a district court's rulings on Article III standing de novo." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quotations omitted).

### 1. Legal Framework

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quotations omitted). "One element of the case-or-controversy requirement is that plaintiffs must

---

[15] The Center abandoned its other claims on appeal, including its Refuge Act claims.

[16] The Service did not initially contest the Center's standing to bring the NEPA claims. We *sua sponte* ordered the parties to file supplemental briefing addressing the Center's NEPA standing.

19

establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quotations omitted).

The plaintiff "bear[s] the burden of establishing standing," *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016), and must have "standing . . . at the time the action is brought," *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007). "Standing must exist throughout the litigation." *Qwest Commc'ns Int'l, Inc. v. F.C.C.*, 240 F.3d 886, 891 (10th Cir. 2001).

"[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotations and citations omitted).

First, the plaintiff must allege that it suffered an injury in fact, which must be (1) "concrete and particularized" and (2) "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An organization has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

In cases where "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially

more difficult to establish." *Defs. of Wildlife*, 504 U.S. at 562 (quotations omitted). But "[a]s a general rule, . . . environmental plaintiffs adequately allege [an] injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013) (quotations omitted).

When the plaintiff alleges a procedural injury, it satisfies the Article III requirement when "the procedures in question are designed to protect some threatened concrete interest of the party that is the ultimate basis of its standing." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017) (alterations omitted).

Second, the plaintiff must show that its injury is "fairly traceable to the challenged action." *Friends of the Earth*, 528 U.S. at 180. "Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). "[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's *actual action* has caused the substantial risk of harm." *Clapper*, 568 U.S. at 414 n.5 (emphasis added).

Third, the plaintiff must show that the injury is redressable—that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defs. of Wildlife*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). "A showing that the relief requested *might*

21

redress the plaintiff's injury is generally insufficient to satisfy the redressability requirement." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).  When the plaintiff alleges a procedural injury, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards of redressability and immediacy." *Defs. of Wildlife*, 504 U.S. at 572 n.7; *see also WildEarth Guardians*, 690 F.3d at 1182.

## 2.  **NEPA Standing**

At the district court and initially on appeal, the Service did not challenge the Center's standing to bring its NEPA claims.  Following oral argument, we *sua sponte* ordered the parties to address the Center's standing as to these claims.  In the supplemental briefs, the Center argues it has standing, and the Service now argues it does not.

At the district court, the Center submitted multiple declarations from its organizational members identifying their affected interests.  *See* App. at 134-37 (declaration of Susan Elofson-Hurst), *id.* at 138-41 (declaration of Jon Lipsky); *id.* at 241-43 (declaration of Bonnie Graham-Reed), *id.* at 1284-87 (declaration of LeRoy Moore), *id.* at 780-82 (declaration of Elizabeth Panzer).  At the preliminary injunction hearing, the Center also elicited testimony from its members pertinent to standing.  *Id.* at 1181-85 (testimony of Elizabeth Panzer), *id.* at 1186-94 (testimony of Jon Lipsky).

a. *Injury in fact*

The Center has shown it suffered an injury in fact through Mr. Lipsky's declaration and his testimony at the preliminary injunction hearing.[17]  In his declaration, Mr. Lipsky averred that he "conduct[s] business in the immediate area of the [Refuge]," "visit[s] just outside the perimeter of the [Refuge] . . . about once per month," and "plan[s] to continue this schedule in the future."  App. at 141.  Mr. Lipsky stated that he reviewed the trail maps the Service provided in the 2018 EAS and determined that "[t]he Trails depicted . . . are significantly different than those previously approved for the Refuge."  *Id.* at 139.  He noted that "[t]he new final map includes a trail entering the east side of the Refuge" in the Wind Blown Area.  *Id.*  He also noted the creation of "[t]rails on the newly acquired 'Section 16' [Parcel,] . . . which was not officially part of the federal property considered 'Rocky Flats,'" so "there has been no study of the impact to this property of [the Service's] decision to route the [t]rails through it."  *Id.* at 139-40.  Thus, "[t]he construction and operation of the [Refuge] poses a health risk to [him]."  *Id.* at 141.

At the preliminary injunction hearing, Mr. Lipsky testified that construction and use of the trails in the Refuge, including the "new configuration into Section 16," would kick up more dust that could be radioactive.  *Id.* at 966.

Mr. Lipsky has demonstrated an injury in fact.  As we explained in *Dine Citizens Against Ruining Our Environment v. Bernhardt*, Mr. Lipsky must show that

---

[17] Mr. Lipsky is a member of the Center.  App. at 138.

the Service's failure to comply with NEPA (1) "created an increased risk of actual, threatened, or imminent environmental harm;" and (2) "the increased risk of environmental harm injures [his] concrete interests by demonstrating either [his] geographical nexus to, or actual use of the site of the agency action." 923 F.3d 836, 840 (10th Cir. 2019) (quotations omitted). Mr. Lipsky did so by identifying the trail modifications made in the 2018 EAS and explaining how they may cause him increased injury.[18]

*Dine Citizens* is further instructive. There, the agency issued an EIS in 2003 to allow almost 10,000 gas and oil wells to be drilled on federally managed lands in New Mexico. *Id.* at 836. The EIS "did not discuss specific sites or approve any individual wells," but it anticipated that most of the wells would be drilled in the northern parts of the managed area. *Id.* (quotations omitted). After issuance of the EIS, operators applied for drilling permits, which prompted the agency to issue an EA evaluating the proposed drilling. *Id.* at 837. The plaintiffs, concerned environmental groups, sued in 2015 challenging the agency's decision to issue permits for hundreds of oil and gas wells. *Id.* at 838.

---

[18] As we discuss in the merits section below, the potential trail expansion into the Wind Blown Area is not part of the 2018 EAS, and the Service properly segmented it from its analysis. But for the purposes of standing, we do not decide the merits of the Center's NEPA claims. *See Dine Citizens*, 923 F.3d at 841 ("Whether th[e] environmental harm is of a manner or to a degree not already considered . . . is a question that goes to the merits of Appellants' NEPA claim. Appellants, of course, need not prove the merits of their claim in order to establish standing.").

We held the plaintiffs had alleged an injury in fact. *Id.* at 840-41. Because they "submitted affidavits that show *an increase* in environmental harm from drilling activities," they adequately alleged that "the agency created an increased risk of actual, threatened, or imminent environmental harm" by skipping NEPA procedures when it authorized the new drilling sites. *Id.* (emphasis added). We also concluded that the plaintiffs proved their concrete interests by presenting affidavits showing that they regularly visited near the well sites and thus established a "geographic nexus to . . . the site." *Id.* at 841.

Like the affidavits in *Dine Citizens*, Mr. Lipsky's declaration and testimony alleged that the changes to the trails would cause an increased risk of radioactive dust exposure. And because he alleged that he regularly visits near the Refuge, he has shown a concrete interest in this increased exposure. He has thus alleged an injury in fact.[19]

---

[19] In contrast, the other declarations and testimony likely fall short of establishing an injury in fact. None alleged that the trail modifications in the 2018 EAS would cause an increase in environmental harm. Instead, they generally opposed construction of trails in the Refuge—a decision made in the 2004 CCP/EIS and the 2005 ROD, not the 2018 EAS. *See* App. at 136 ("If construction on the Refuge were to proceed . . . the plutonium and other hazardous substances present on the Refuge and disturbed by the construction would harm me . . . ."), *id.* at 242-43 (same), *id.* at 781 ("My family's health will be put at even greater risk by allowing the [Service] . . . to begin construction on the Refuge . . . ."), *id.* at 1184 ("Even if I didn't want to go to the refuge, if it was open, I can't keep . . . microscopic particles of possible contaminants out of my house if my neighbors bring them into the neighborhood.").

But since "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," we may proceed to the merits without determining the other members' standing. *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also Campbell v. Buckley*, 203 F.3d 738, 740 n.1

b. *Traceability*

The Center has also shown that its NEPA injury is fairly traceable to the challenged agency action. "In the context of a NEPA claim, the injury is the *increased* risk of environmental harm to concrete interests." *Dine Citizens*, 923 F.3d at 843-44 (quotations and alterations omitted). Here, through Mr. Lipsky, the Center has alleged that the Service's failure to comply with NEPA when it modified the trails has increased the risk that the Center's interests will be harmed. *Id.* at 844 ("Appellants have alleged that the [agency] did not comply with NEPA in granting the challenged [permits], and that its alleged failure resulted in the agency's *uninformed* decisionmaking as to these additional wells. This is sufficient to establish causation." (quotations omitted)). It has thus shown causation.

c. *Redressability*

Finally, the Center has shown that its injury is redressable. When a plaintiff alleges a procedural violation, we relax the redressability requirements. *Defs. of Wildlife*, 504 U.S. at 572 n.7. In this context, "a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996). The plaintiff must show only "that its injury would be redressed by a favorable decision requiring

_____

(10th Cir. 2000) ("Because the individual plaintiffs . . . have standing, and because . . . [they] jointly raise the same substantive arguments on appeal, . . . there is no need to address the standing of the [other] plaintiffs." (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (alterations omitted)).

26

compliance with NEPA procedures." *Dine Citizens*, 923 F.3d at 844 (quotations omitted).  The Center has done so here.  It alleges that the Service failed to comply with NEPA, and a favorable decision would compel the Service to meet its NEPA obligations.  The Center has thus shown its injury is redressable.

*    *    *    *

In sum, the Center has done enough to establish standing to bring its NEPA claims.  We repeat, however, that many of the Center's standing arguments hinge on the opening of the Refuge, which is not the agency action before us.  But the Center is correct that we cannot conflate our standing inquiry with analysis of the merits of its NEPA claims.  We address the merits below.

3.  **ESA Standing**

The Center challenges the district court's dismissal of its ESA claim for lack of standing.  For standing, the Center relies on Randal Stafford's interest[20] in the Preble's meadow jumping mouse, an endangered species that resides on the Refuge.  His interest is insufficient to confer standing.

The Center attached Mr. Stafford's declaration to its motion for a preliminary injunction.  In it, Mr. Stafford stated that he has "a personal interest in the protection and conservation of . . . the threatened Preble's Meadow Jumping Mouse."  App. at 110.  He averred that he "derive[s] great aesthetic, spiritual and recreational benefits from looking for and seeing such species, studying them, enjoying their

---

[20] Mr. Stafford is a member of the Center.  App. at 109.

27

presence in their natural environment and knowing that the provisions of the [ESA] are protecting and conserving the Jumping Mouse and its Critical Habitat in the Refuge." *Id.*

During the preliminary injunction hearing, Mr. Stafford testified that he had never visited the Refuge but had visited friends who lived nearby and biked around its boundaries. *Id.* at 1196. He clarified he was interested in the Preble's mouse as a source of food for birds that he enjoyed watching. *Id.* at 1197. He expressed concern that "[i]f the refuge is opened to the public, I think there is a possibility that the construction and use of the trails and grounds of the refuge will result in the disruption of the habitat and reproduction of" the Preble's mouse, which in turn would have a detrimental impact on the birds who prey upon it. *Id.* at 1198. Although he said he would "find [it] interesting" to see the Preble's mouse jump, he conceded he had never looked for, seen, or seriously studied the Preble's mouse. *Id.* at 1201-02. He also admitted he "probably would not visit [the Refuge] just to see the Preble's . . . mouse." *Id.* at 1204.

We doubt the Center has alleged an injury in fact based on Mr. Stafford's interests. But rather than decide that issue, we deny standing for failure to show the alleged injury is fairly traceable to the challenged agency action—the trail modifications approved in the 2018 EAS. Mr. Stafford's declaration and accompanying testimony show his purported injury stems from the construction of *any* trail, not the trail modifications made in the 2018 EAS. *Id.* at 110 ("The construction . . . of multipurpose trails and the paved Rocky Mountain Greenway

28

[trail] in the Refuge would irreparab[ly] harm my interests in the . . . Preble's Meadow Jumping Mouse . . . ."); *id.* at 1198 ("If the refuge is opened to the public, I think there is a possibility that the construction and use of the trails . . . will result in disruption of the [Preble's mouse's] habitat . . . .").

The decision to construct trails in the Refuge was made in the 2004 CCP/EIS and 2005 ROD. The Center cannot now challenge that decision. For ESA standing, it must link Mr. Stafford's injury to the trail modifications made in the 2018 EAS. It has failed to allege any link between the 2018 trail modifications and a detrimental impact on the Preble's mouse or its habitat. The Center has thus failed to meet the second element of standing, so we affirm dismissal of its ESA claim.

### B. *NEPA Claims*

Because the Center has standing to bring its NEPA claims, we turn to the merits. "We review de novo a district court's decision in an APA case." *Biodiversity Conservation All.*, 762 F.3d at 1059.

The Center argues the Service violated NEPA by (1) segmenting the proposed trail modification into the Wind Blown Area from the 2018 EAS's analysis, (2) relying on the categorical exclusions to avoid conducting an EA, and (3) failing to prepare a supplemental EIS based on significant new circumstances.

We will set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

29

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* "When courts consider such challenges, an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion." *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) (citations omitted). Our deference "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Russell*, 518 F.3d at 824 (quotations omitted). With these principles in mind, we turn to the Center's arguments.

1. **Segmentation**

The Center argues the Service was not permitted to exclude the proposed trail extension and access point in the Wind Blown Area from the 2018 EAS. It contends this potential modification was so intrinsically linked to the modifications made in the 2018 EAS that the Service had to evaluate the Wind Blown Area proposals in the same assessment. We disagree.

Under NEPA, an agency must consider "[c]onnected actions," "[c]umulative actions," and "[s]imilar actions" in the "same impact statement." 40 C.F.R. § 1508.25(a)(1)-(3). This regulation "prevent[s] agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not

have a significant environmental impact." *Citizens' Comm. to Save Our Canyons v.*

*U.S. Forest Serv.*, 297 F.3d 1012, 1028 (10th Cir. 2002).

To determine whether two actions are connected, we apply the independent-

utility test.[21]  Under that test, "two proposed actions [are] connected where one action

could not occur but for the occurrence of the other." *Id.* at 1029.  On the other hand,

"projects that have independent utility are not connected actions." *Id.* (quotations

omitted).

The trail modifications in the 2018 EAS have independent utility and do not

depend on the potential modifications in the Wind Blown Area.  The modifications

made to the Rocky Mountain Greenway trail remain viable even if the Service never

proceeds with expansion of the trail into the Wind Blown Area or creates an access

point there.  Nor does the Service's stated goal of trail interconnectedness undermine

the independent utility of the modifications to the Rocky Mountain Greenway trail.

As the Service notes, even without the proposed expansion into the Wind Blown

Area, trail users would still have access to an "out-and-back" trail.  Trail users can

enter the Refuge from the northern entrance and access the Rocky Mountain

---

[21] The applicable regulations state that a proposed action is connected to other actions if the proposed action (1) "[a]utomatically trigger[s] other actions which may require [EISs], (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or (3) is an "interdependent part[] of a larger action and depend[s] on the larger action for [its] justification."  40 C.F.R. § 1508.25(a)(1). In *Citizens' Committee to Save Our Canyons*, we followed other circuits and held that proposed actions are not closely related—and therefore do not require concurrent analysis under 40 C.F.R. § 1508.25—if they have independent utility.  297 F.3d at 1029.

31

Greenway trail from there. The trail travels southwest first, taking visitors to the historic caprock mine in the Section 16 Parcel. It then continues eastward, and users can connect to the East Woman Creek Loop trail, which itself provides two points of departure from the Refuge. Indeed, the Service has opened the Refuge's trails for public use without the trail expansion into the Wind Blown Area.[22] Oral Arg. at 18:40-19:03. The modifications therefore have independent utility, and it was not arbitrary or capricious for the Service to segment the potential changes in the Wind Blown Area from its analysis.[23]

---

[22] The Service has not committed to expanding the Rocky Mountain Greenway trail into the Wind Blown Area or to creating an access point there. By mentioning the potential changes in the 2018 EAS, the Service has alerted the Center and other concerned parties that such an action may take place later. *See* 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process . . . at the earliest possible time to insure that planning and decisions reflect environmental values . . . and to head off potential conflicts."). At oral argument, the Service confirmed that it has yet to make any determination on whether to proceed with those proposals. *See* Oral Arg. at 18:57-19:03.

[23] For the same reasons, the potential changes in the Wind Blown Area are not cumulative. Actions have cumulative impact when they are "so interdependent that it would be unwise or irrational to complete one without the others." *Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 430 (10th Cir. 1996) (quotations omitted); *see Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1173 (10th Cir. 2002). The Center offers nothing to show that the trail modifications in the 2018 EAS are "unwise or irrational" should the Service never proceed with the potential modifications in the Wind Blown Area.

To the extent the Center argues the potential changes in the Wind Blown Area are similar to the proposed trail modifications and thus should have been analyzed concurrently in the 2018 EAS, it has waived this argument through inadequate briefing. *See Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019). In its opening brief, the Center quoted the applicable regulation but failed to develop any argument in support. Aplt. Br. at 22-23.

2. **Categorical Exclusions and Extraordinary Circumstances**

The Service relied on three categorical exclusions for the trail modifications to avoid having to perform an EA.  It determined the action consisted of:

1) "minor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures;"

2) "minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated;" and

3) "the issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned."

AR 9 (citing 516 DM § 8.5(B)(7), (9)-(10)).  It also concluded no extraordinary circumstances rendered the 2018 EAS ineligible for the categorical exclusions.

The Center does not challenge the categorical exclusions.  Instead, it argues that two extraordinary circumstances foreclosed the use of the categorical exclusions: (a) the impact on public health, and (b) the highly controversial nature of the project. We address each in turn.

a. *The impact on public health or safety*

The Center argues the trail modifications' impact on public health presented extraordinary circumstances.  *See* 43 C.F.R. § 46.215(a) (extraordinary circumstance exists if the action may "[h]ave significant impacts on public health or safety").  Its arguments are not convincing.

33

First, the Center points to elevated plutonium levels in the Wind Blown Area. It contends that because the Service has previously conceded that the Wind Blown Area has elevated plutonium levels, the trail modifications constitute an extraordinary circumstance. But as discussed above, any potentially elevated plutonium levels in the Wind Blown Area are not relevant. The potential trail modification into the Wind Blown Area is not part of the challenged agency action because the Service excluded it from the 2018 EAS. The Center thus cannot use potentially elevated risks in the Wind Blown Area to establish that the 2018 EAS's trail modifications may have a significant impact on public health.

Second, the Center argues the Service has previously acknowledged that different parts of the Refuge have varying levels of plutonium radiation. As a result, the modified trails could end up in a higher radiation area, which could harm public health. This argument fails. The 2004 CCP/EIS considered the varying plutonium levels across the Refuge and determined that the Refuge was generally safe for public use. The Center has failed to show why the trail modifications approved by the 2018 EAS present an added risk to public health on this ground.[24]

---

[24] As we discuss below, to the extent the Center bases its concern on the trail modification that cuts into the Section 16 Parcel, it ignores that the Service made the decision to incorporate the parcel into the Refuge in 2011, when the Service prepared an EA and issued a FONSI. The Service based its determination in part on soil sampling taken on the border of the parcel and the Refuge, finding that the plutonium levels there were sufficiently low to allow for the acquisition.

b. *The highly controversial nature of the action*

The Center also argues that the 2018 EAS trail modifications are highly controversial, precluding the Service's use of the categorical exclusions. *See* 43 C.F.R. § 46.215(c) (extraordinary circumstance exists if the action may "[h]ave highly controversial environmental effects"). This argument fails to link the controversy to the challenged agency action.

First, the Center relies on the controversy surrounding the opening of the Refuge for public use. Aplt. Br. at 33-35. But that controversy did not arise because of the 2018 EAS trail modifications. The 2004 CCP/EIS addressed public opposition to the opening of the Refuge. The Service conducted an extensive environmental analysis and decided to proceed with the opening. The Center cannot use the original controversy in 2004 to establish an extraordinary circumstance now. To conclude otherwise would prohibit the Service from using categorical exclusions for actions related to the Refuge and would undermine the purpose of these exclusions. *See Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 742 (10th Cir. 2006) ("By relying on categorical exclusions, the Forest Service promotes efficiency in its NEPA review process while avoiding unnecessary analysis."). The Center therefore cannot use the controversy surrounding the initial decision to open the Refuge to prove that the trail modifications are highly controversial.

Second, the Center argues for the first time on appeal that the 2018 EAS is highly controversial because it proposed placing an access point in the Wind Blown

Area.  It argues this decision is highly controversial because the Service discussed placement of the access point with affected municipalities.

The Center has waived this argument because it failed to present it to the district court and has not argued plain error here.  *See Little v. Budd Co., Inc.*, 955 F.3d 816, 821 (10th Cir. 2020).  "[W]e may not reverse the district court's judgment in *this* case based on theories coined for the first time only on appeal unless [the Center] makes a showing of plain error—something [it] has not even attempted." *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1245 (10th Cir. 2011).  Even assuming it did not waive this argument, and even assuming the discussions with the municipalities are sufficient to render the action highly controversial, the Center's argument still fails.  As discussed above, the 2018 EAS did not determine the access point in the Wind Blown Area and reserved this decision for the future.  It acknowledged that this issue would require an additional NEPA determination.  The Center cannot use a potential controversy surrounding a future decision to prove that the agency action challenged here is highly controversial.  The Center thus has not shown that the 2018 EAS is highly controversial.

*      *      *      *

The Service relied on categorical exclusions to make the trail modifications in the 2018 EAS.  It did so after concluding no extraordinary circumstances existed that would prohibit the use of these exclusions.  The Center has failed to show that the Service's reliance on the categorical exclusions to make the trail modifications was arbitrary or capricious.

36

3. **Supplemental EIS**

The Center argues the Service needed to prepare a supplemental EIS because its acquisition of the Section 16 Parcel and ensuing decision to build a trail on the parcel presented a significant new circumstance.

"An agency must prepare a supplemental assignment if the agency makes substantial changes in the proposed action that are relevant to environmental concerns." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 (10th Cir. 2009) (quotations and alterations omitted). But "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* Thus, "[w]hen the relevant environmental impacts have already been considered earlier in the NEPA process, no supplement is required." *New Mexico ex rel. Richardson*, 565 F.3d at 705 (quotations omitted).

In determining whether a supplemental EIS is required, we apply the rule of reason, which "turns on the value of the new information to the still pending decisionmaking process." *Marsh*, 490 U.S. at 374. "If there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* (quotations and alterations omitted).

37

Neither the acquisition of the Section 16 Parcel nor the decision to extend a trail onto it amounted to a significant new circumstance requiring a supplemental EIS. As to the acquisition of the Section 16 Parcel, the Service evaluated that issue in 2011. The acquisition is not the challenged agency action here. As to the one-mile trail extension into the Parcel, which is part of the challenged agency action here, the Center fails to explain how the modification of a trail that cuts into the Section 16 Parcel is a significant new circumstance. The Service thus did not act arbitrarily and capriciously when it did not prepare a supplemental EIS regarding extension of a trail into the Section 16 Parcel.[25]

*    *    *    *

In sum, the Service did not act arbitrarily or capriciously in (1) segmenting the Wind Blown Area potential proposals from its analysis, (2) concluding no

---

[25] Even assuming the Service's acquisition of the Section 16 Parcel was the challenged agency action, the Center has failed to show it was a significant change in circumstances. When the Service acquired the parcel, it conducted an EA and issued a FONSI. It did so after it "found no known or observable environmental contaminant[] issues related to the parcel." AR 1038. The Service reached this conclusion based in part on "[a] survey of Refuge lands conducted by the Department of Energy and the [Service] in 2006" that included 41 soil samples across the Refuge, only three of which contained plutonium levels above 1 pCi/g. AR 1047.

The Service acknowledged that these samples "did not address Section 16" and "soil samples were collected adjacent to the northern and eastern property boundaries [of Section 16]. [But] [e]ach of these samples yielded actinide concentrations well below 1 pCi/g." *Id.* Thus, an area *closer* to the Industrial Area than the Section 16 Parcel had plutonium radiation levels well below the 50 pCi/g threshold.

The Center fails to point to any evidence undermining the 2011 FONSI. The Center cites testimony it presented at the preliminary injunction hearing regarding a photograph of a barrel that the Service included in the 2011 FONSI. We address this testimony below.

extraordinary circumstances existed, or (3) determining that no significant new circumstances compelled a supplemental EIS.

### C. *Supplemental and Extra-Record Documents*

Finally, the Center argues the district court should have (1) supplemented the administrative record with evidence that the Service improperly excluded, and (2) considered extra-record evidence that allegedly would undermine the Service's analysis in the 2018 EAS.

"We review a district court's determination of whether or not to exclude extra-record evidence for abuse of discretion." *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). We apply the same standard to a district court's refusal to supplement the administrative record. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

When a court evaluates whether an agency has complied with the APA, its review "is generally based on the full administrative record that was before all decision makers." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). "The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Id.* "[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *Id.* at 740. We must therefore "assume[] the agency properly designated the Administrative Record absent clear evidence to the contrary." *Id.*

39

In "extremely limited" circumstances, a court may supplement the administrative record or consider extra-record evidence. *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). Known as the *American Mining Congress* exceptions, they include when (1) "the record is deficient because the agency ignored relevant factors it should have considered," (2) "the agency considered factors that were left out of the formal record," and (3) "evidence coming into existence after the agency acted demonstrates that the actions were right or wrong." *Id.* The Center fails to show the district court abused its discretion in determining that the evidence at issue here falls outside these exceptions.

1. **Supplementation of the Administrative Record**

We first address the four documents that the Center argues the Service excluded from the administrative record and the district court refused to add.

First, the Center argues the district court should have added the 2012 Kaltofen Study to the administrative record because it showed elevated plutonium levels in the Refuge. The 2012 Kaltofen Study assessed the dispersion of plutonium from the Industrial Area (in the Refuge's center) to the eastern part of the Refuge and beyond. But, as previously discussed, the 2018 EAS did not make any changes to the eastern part of the Refuge. At most, the Service stated that it might make trail modifications in the Wind Blown Area, but it reserved this decision for a future NEPA

determination.  The 2012 Kaltofen Study is thus not relevant to the trail modifications made in the 2018 EAS.[26]

Second, the Center contends that the Service improperly excluded the *Cook* jury verdict form from the administrative record.  As with the 2012 Kaltofen Study, the *Cook* jury verdict form concerned plutonium levels to the east of the Industrial Area.[27]  It thus had no bearing on the Service's 2018 decision to make trail modifications on the western part of the Refuge.

Third, the Center argues the 2011 email chain between Service officials discussing trail modifications should have been part of the administrative record.  The 2011 email chain mentioned a possible trail alteration that would put one trail near the plutonium plume area in the eastern portion of the Refuge.  The Center fails to explain how the emails concern the trail modifications made in the 2018 EAS.  The 2018 EAS did not address changes to the trail routes in the plutonium plume area.  Without more, the Center cannot show the district court abused its discretion in declining to add the 2011 email chain to the administrative record.

---

[26] Even assuming the 2012 Kaltofen Study was relevant to the agency action here, its findings of residual plutonium exposure are not inconsistent with the Service's findings in the 2004 CCP/EIS.  As the Service notes, the 2012 Kaltofen Study determined that there were plutonium levels up to 1,579 pCi/Kg, App. at 112, but that translates to 1.5 pCi/g—well below the 50 pCi/g the Service set as the maximum allowed in the Refuge.  AR 5592.

[27] The *Cook* jury verdict form stemmed from a 2006 civil trial against Rockwell International Company and Dow Chemical Company.  The jury found the defendants liable for trespass by exposing the plaintiffs' properties, which were located east of the Refuge, to plutonium.

Fourth, the Center argues the district court should have added the 2018 Nichols declaration to the administrative record. This declaration discussed testing on the site in the 1970s that showed elevated radiation levels. The Center prepared this declaration in support of its motion for a preliminary injunction. It fails to explain why a declaration prepared for litigation challenging an agency action should be part of the administrative record. The district court did not abuse its discretion in declining to add it.[28]

## 2. **Extra-Record Evidence**

The Center also argues the district court abused its discretion in declining to consider evidence that was not part of the administrative record. On rare occasions, a court may consider "evidence coming into existence after the agency acted [that] demonstrates that the actions were right or wrong." *Am. Mining Cong.*, 772 F.2d at 626. The Center argues the district court abused its discretion by failing to do so here.

First, the Center argues the district court should have weighed the testimony from the witnesses it presented during the preliminary injunction hearing.[29] But

---

[28] The 2018 Nichols declaration may be more accurately characterized as extra-record material. If it were, our analysis above would not change.

[29] The Center solicited testimony from (1) John Barton, a former employee at the Rocky Flats plant; (2) Mr. Nichols, a scientist who performed plutonium testing in the Refuge during the 1970s; (3) Michael Ketterer, a former EPA official who tested for plutonium on the eastern part of the Refuge; and (4) Mr. Lipsky, a former FBI officer who was involved in a criminal investigation of the Rocky Flats plan in the late 1980s and early 1990s.

much of the testimony the Center solicited was speculative, and the district court was within its discretion to decline to consider it. For instance, the Center points to testimony from two witnesses, including Mr. Lipsky, about the photograph of the barrel located in the Section 16 Parcel. They claimed the barrel originated from the Industrial Area. But they conceded that they did not inspect the barrel and that they based their suspicions solely on the photograph. App. at 921, 926-27, 969.

The other testimony fares no better. Some witnesses focused on plutonium levels in the eastern part of the Refuge. *Id.* at 954. Others discussed testing that occurred in the 1970s. *Id.* 931-48. This testimony lacks any nexus to the challenged agency action—the modification of the trails. And as discussed above, the 2018 EAS made no trail modifications on the eastern part of the Refuge. And the testimony regarding 1970s testing appears to be a renewed challenge to the Service's 2005 ROD opening the Refuge for public use. The district court did not abuse its discretion in declining to consider this testimony.

Second, the Center argues the district court should have considered a 2019 memorandum from the Broomfield City Council[30] noting that the Service was relocating prairie dogs into the Refuge. The Center contends the prairie dogs would disturb and expose contaminated Refuge soil. This memorandum is speculative and lacks any connection to the challenged agency action. The Center fails to link the reintroduction of prairie dogs to the trail modifications. At most, this document

---

[30] Broomfield City is located just outside the Refuge's eastern boundary.

could relate to the Service's decision in 2005 to open the Refuge for public use, but that is not the agency action before us. We therefore see no abuse of discretion.

Third, the Center argues the district court should have considered soil sampling taken in 2019 to the east of the Refuge showing plutonium levels that exceeded the limit the EPA set. Even if this sampling may be relevant to potential trail modifications in the eastern part of the Refuge, it has no bearing on the challenged agency action. Again, the Service made no changes to trails on the eastern part of the Refuge in the 2018 EAS. The district court did not abuse its discretion.

## III. CONCLUSION

We affirm.